# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF KENTUCKY
## NORTHERN DIVISION
## AT ASHLAND

CIVIL ACTION NO. 15-5-DLB-EBA

MARY GRIFFITH, as Administratrix of                                    PLAINTIFF
the Estate of Tracy Eugene Griffith


vs.                          **MEMORANDUM OPINION AND ORDER**


CORRECTHEALTH KENTUCKY, LLC, et al.                          DEFENDANTS

\* \*  \* \*  \* \*  \* \*  \* \*  \* \*  \* \*  \* \*

On February 12, 2014, Tracy Eugene Griffith was arrested for parole and probation violations and transported to the Carter County Detention Center (the "Detention Center"), where he was booked and placed into the general population.  Griffith's time at the Detention Center was short-lived, he died only two days later—on February 14, 2014—as a result of pyopneumoperitoneum, perforation of duodenal ulcer, and peptic ulcer disease.  This case is about the medical care Griffith received during those two days.  The question is whether a reasonable jury could find that Defendants were deliberately indifferent to Griffith's serious medical needs, negligent, or both.

Plaintiff Mary Griffith, the mother and administratrix of Griffith's estate, filed a Complaint on January 28, 2015, seeking to hold a litany of defendants liable for Griffith's death.  Many of these Defendants have been dismissed from this action.  (Doc. # 30).  Remaining are three defendants: Correcthealth Kentucky, LLC ("Correcthealth"), the private corporation who contracted with the Detention Center to provide medical services to inmates, and Michale D. Nichols and Susie Hatfield, the nurse and nurse practitioner

who were responsible for Griffith's care (collectively "Defendants"). In her Complaint, Plaintiff asserts constitutional claims, pursuant to 42 U.S.C. § 1983, alleging that the Defendants violated Griffith's constitutional rights to adequate medical care, as well as a wrongful-death claim. (Doc. # 1 at ¶¶ 1, 41-56). The Court has federal-question jurisdiction under 29 U.S.C. § 1331 and supplemental jurisdiction under 29 U.S.C. § 1367.

This matter is before the Court upon Defendants Correcthealth Kentucky, LLC, Michael D. Nichols, and Susie Hatfield's Motion for Summary Judgment (Doc. # 48). The Motion is fully briefed (Docs. # 51 and 52), and ripe for review. Because Plaintiff cannot establish that the Defendants were deliberately indifferent to a serious medical need, Defendants' Motion for Summary Judgment is granted as to Plaintiff's constitutional claim. However, rather than enter judgment as to her state-law claims, the Court declines to exercise supplemental jurisdiction, and thus dismisses Plaintiff's wrongful-death claim without prejudice.

## I.     FACTUAL AND PROCEDURAL BACKGROUND

After being arrested for parole and probation violations, Tracy Griffith spent less than 48 hours at the Detention Center—from Wednesday, February 12, 2014 at 12:03 p.m., when he was booked into the jail—until Friday, February 14, 2014 at approximately 8:00 a.m., when he died. (Doc. # 51 at 2, 3-4).

Upon his arrival at the Detention Center, Griffith was processed by Deputy Jailer Denise Knipp. (Doc. # 48-4). As part of the intake process, Deputy Knipp conducted a medical screening, where she asked Griffith a series of health-related questions from the "Standard Medical Questions" form. *Id.* at 12:3-9. It included the following questions: "Do you need immediate medical attention?" "Have you recently been hospitalized or treated

by a doctor?"  "Do you have any type of medical problems that we should be aware of?"
(Doc. # 48-12).  To each of these questions, Griffith answered "No."  *Id.*  However, Griffith
answered in the affirmative to other questions, including: "Do you have a serious medical
condition that will require treatment here?" and "Are you currently taking prescribed
medications that may need to be continued?"  *Id.*  When questioned about his conditions,
Griffith indicated that he had "Hep[atitis]-C," but was only able to explain his "serious
medical conditions" as back-and-stomach related.  (Doc. # 48-4 at 12:10-13:23).  Deputy
Knipp attempted to inquire further, but Griffith stated that he did not know the name of his
stomach condition.  *Id.* at 13:3-16.[1]

After the intake process was completed, at approximately 12:07 p.m., Griffith was
assigned to a general-population cell.  (Doc. # 48-4 at 16:6-17:7; 18:2-5).  Although Griffith
complained of stomach pain during the booking process, when Deputy Knipp asked
whether he needed medical attention, Griffith declined, and thus, Deputy Knipp did not
refer Griffith for a medical review and did not place him in a medical-observation cell.  *Id.*
at 15:3-14; 17:8-18:1.  Griffith made no other complaints that day, and did not appear to
be in pain.  (Doc. # 51-5 at 36:17-19).

The next morning—at approximately 10:30 a.m. on Thursday, February 13, 2014—
Griffith complained of severe abdominal pain.  (Doc. # 51-4 at 7:3-21).  Deputies
responded to Griffith's complaints and escorted him to the medical observation area.
(Docs. # 51-4 at 7:22-8:3; 51-5 at 34:15-18).

---

[1]     Griffith also provided notable answers to two other questions.  In response to the question
"Do you have a learning disability that would impact your ability to follow instructions?"  Griffith
answered "Yes."  (Doc. # 48-12).  Perhaps relatedly, Griffith responded "No" to the question "Do
you understand the questions I have asked you?"  Despite Griffith's answers to these questions,
there is nothing in the record to support the allegation that Griffith suffered from mental deficits.
Nor do these facts impact the conclusion in this case.  *See supra* note 8.

At approximately 11:00 a.m., Michale Nichols, a registered nurse, examined Griffith. (Doc. # 48-13 at 1). During the examination, Nurse Nichols observed Griffith vomiting in a trash can, and she noted a "large amount of emesis," "green/brown in color," with "undigested food." *Id.* Nurse Nichols checked Griffith's blood pressure, pulse, temperature, and respiration, which were all within normal parameters. *Id.* She also found Griffith to be "alert," "oriented," "coherent," and "ambulatory." *Id.* With respect to his stomach pain, Griffith informed Nurse Nichols that his pain had "started a couple hours ago," but reported having "normal bowel movements" and no difficulty urinating. *Id.* Upon examination, Nurse Nichols found Griffith's abdomen was "soft" and "non-tender to touch." *Id.* Nurse Nichols also noted that Griffith had active bowel sounds in all four quadrants. *Id.* At that time, Griffith informed Nurse Nichols of a history of pancreatitis. *Id.*; *see also* (Doc. # 48-6 at 20-22). He made no mention of ulcers or peptic ulcer disease. *Id.* After the examination, Nurse Nichols called Susie Hatfield, the nurse practitioner, for orders. (Doc. # 48-13). Nurse Practitioner Hatfield's clinical impression indicated possible pancreatitis, and she issued orders for Phenergan and a liquid diet. (Doc. # 48-6 at 58:6-8). Griffith was also placed in a medical-observation cell. (Doc. # 48-13 at 1).

Nurse Nichols checked on Griffith an hour later—at 12:00 p.m.—and found him "resting in his cell." *Id.* By 2:30 p.m., however, Griffith was again complaining of severe abdominal pain. *Id.* Accordingly, Nurse Nichols again contacted Nurse Practitioner Hatfield, and a "telemed" examination was arranged. *Id.* The medical records reflect that a "telemed" examination was conducted at 2:40 p.m. *Id.* at 2. Nurse Nichols again checked Griffith's blood pressure, pulse, temperature, and respiration, which were all within normal parameters. *Id.* Griffith's abdomen continued to be soft and non-tender to

touch.  *Id.*  However, during the "telemed" examination, Griffith informed Nurse Nichols and Nurse Practitioner Hatfield that he had recently been seen in the Emergency Room at King's Daughters Medical Center "for the same problem."  *Id.*  Accordingly, a medical-records request was signed and faxed to King's Daughters Medical Center.  *Id.*

After the "telemed" examination, Nurse Practitioner Hatfield ordered one gram of Tylenol for Griffith's pain and ordered Griffith's blood to be drawn for multiple tests, including: complete blood count, comprehensive metabolic profile, amylase, lipase, and a urinalysis.  *Id.* at 2, 4; *see also* (Doc. # 48-6 at 46:1-47:23).  In her deposition, Nurse Practitioner Hatfield explained that she ordered a complete blood count because Griffith "was complaining of abdominal pain" and "had a history of pancreatitis," thus, she "wanted to check and see if he had any elevation in his white blood cell count," which would indicate an infection.  (Doc. # 48-6 at 46:14-24).  Nurse Practitioner Hatfield also ordered a comprehensive metabolic profile, amylase and lipase tests, and a urinalysis to assess Griffith's pancreas, liver, and kidney function.  *Id.* at 47:10-21.

Within twenty minutes, Nurse Nichols had performed the urinalysis and noted that Griffith's urine was "amber in color," and that the urine was negative for leukocytes, nitrites, blood, and glucose.  (Docs. # 48-13 at 2; 48-6 at 48:18-49:20).  The urinalysis also showed unremarkable urobilinogen, protein, PH, and ketone levels, and indicated only that Griffith might have been dehydrated.  (Doc. # 48-6 at 48:8-49:18).  Nurse Nichols reviewed these results, as well as the medical records from King's Daughters Medical Center, with Nurse Practitioner Hatfield at 3:00 p.m.  (Doc. # 48-13 at 2).  The medical records listed Griffith's medications, specifically Tylenol and Hydrocodone.  (Doc. # 48-6 at 56:12-20).  Notably absent from the medical records received was any mention or

indication that Griffith had a history of duodenal ulcers or peptic ulcer disease.  *Id.*  After this telephone call, Nurse Practitioner Hatfield ordered Nurse Nichols to re-check Griffith in one hour.  *Id.*

At 3:40 p.m., Nurse Nichols drew Griffith's blood for the complete blood count, comprehensive metabolic profile, and amylase and lipase tests.  *Id.*  She also re-checked Griffith's blood pressure, pulse, temperature, and respiration, which continued to be within normal parameters.  *Id.*  In the same entry, Nurse Nichols also noted that there were "[n]o further complaints from inmate Griffith [at] this time," so he was sent back to his cell to lay down.  *Id.*  Thereafter, Nurse Nichols contacted Quest Diagnostic for "STAT pick up."  *Id.*  Within twenty minutes, Quest Diagnostic arrived "for lab pick up."  *Id.*

At approximately 4:10 p.m., Nurse Nichols went off-duty and "advised" Deputy McDavid that if Griffith experienced "problems to contact Susie Hatfield" and gave permission for jail officials to "administer another dose of Tylenol 1gm [and] Phenergan 25mg … if Inmate Griffith requested."  *Id.* at 2-3.  Nurse Nichols's notes indicate that at approximately 10:00 p.m., she "called Deputy McDavid from home to check on Inmate Griffith" and was advised that Griffith "has complained of pain [and] nausea" and had been administered one gram of Tylenol and twenty-five grams of Phenergan at approximately 7:30 p.m.  *Id.* at 3.  Nurse Nichols's notes reflect that Deputy McDavid informed her that Griffith "was resting quietly in his medical observation cell" at the time of her call, and that she instructed Deputy McDavid to inform midnight shift that they could Contact Hatfield if needed.  *Id.*  Plaintiff has called Nurse Nichols's 10:00 p.m. call into question, as the Detention Center's call logs do not reflect the call.  (Doc. # 51 at 3).

During the approximately eighteen hours that Griffith was in the medical-observation cell, jail officials performed forty-eight separate monitoring checks. (Doc. # 48-14). At the last check—at 6:45 a.m. on Friday, February 14, 2014—Griffith was observed "quiet" and "relaxed." *Id.* But within an hour, sometime around 7:40 a.m., Deputy Joe Littleton, a sergeant on the midnight shift, checked on Griffith and observed that he "was a little bit pale" and that his stomach did not appear to rise or fall. (Doc. # 48-8 at 19:3-17). Because of these observations, Deputy Littleton had the cell door opened and checked Griffith's pulse. *Id.* at 19:17-20. When he did not feel a pulse and did not see or feel Griffith breathing, he instructed other jail officials to call 911 and commenced CPR efforts on Griffith. *Id.* at 19:21-20:6. Deputy Littleton performed CPR until EMS arrived. *Id.* at 20:11-13. At that time, Griffith was pronounced dead. *Id.* at 20:14-22. An autopsy later determined that Griffith died as a result of pyopneumoperitoneum, perforation of duodenal ulcer, and peptic ulcer disease.

Defendants claim that these facts, even when construed in favor of the Plaintiff, do not create a genuine dispute as to any of Plaintiff's claims. (Doc. # 48-1 at 17). Specifically, Defendants claim that the Plaintiff has failed to prove that they were deliberately indifferent to Griffith's serious medical needs; failed to establish that Correcthealth had a policy, procedure, or custom resulting in inadequate medical care; and failed to prove that Defendants' care fell below the established standard of care and proximately caused Griffith's death. *Id.* In response, the Plaintiff argues that there is sufficient evidence from which a jury could find that the Defendants were deliberately indifferent, that Correcthealth is liable for establishing and executing policies that resulted in constitutional violations by its employees, and that Defendants' care fell below the

standard of care and proximately caused Griffith's death.  (Doc. # 51).

## II.    ANALYSIS

### A.    Standard of Review

Summary judgment is appropriate when the record reveals "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  A genuine dispute of material fact exists where "there is sufficient evidence … for a jury to return a verdict for" the non-moving party.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986).  The "moving party bears the burden of showing the absence of any genuine issues of material fact."  *Sigler v. Am. Honda Motor Co.*, 532 F.3d 469, 483 (6th Cir. 2008).  Once a party files a properly supported motion for summary judgment, by either affirmatively negating an essential element of the non-moving party's claim or establishing an affirmative defense, "the adverse party must set forth specific facts showing that there is a genuine issue for trial."  *Anderson*, 477 U.S. at 250.  However, "the mere existence of a scintilla of evidence in support of the [non-moving party's] position will be insufficient."  *Id.* at 252.

The Court must "accept Plaintiff's evidence as true and draw all reasonable inferences in [her] favor."  *Laster v. City of Kalamazoo*, 746 F.3d 714, 726 (6th Cir. 2014) (citing *Anderson*, 477 U.S. at 255).   The Court is not permitted to "make credibility determinations" or "weigh the evidence when determining whether an issue of fact remains for trial."  *Id.* (citing *Logan v. Denny's, Inc.*, 259 F.3d 558, 566 (6th Cir. 2001)).  "The ultimate question is 'whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.'"  *Back v. Nestle USA, Inc.*, 694 F.3d 571, 575 (6th Cir. 2012) (quoting

*Anderson*, 477 U.S. at 251-52).  If there is a dispute over facts that might affect the outcome of the case under governing law, the entry of summary judgment is precluded. *Anderson*, 477 U.S. at 248.

As the moving parties, the Defendants must shoulder the burden of showing the absence of a genuine dispute of material fact as to at least one essential element of Plaintiff's claim.  Fed. R. Civ. P. 56(c); *see also Laster*, 746 F.3d at 726 (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986)).  Assuming Defendants satisfy their burden, the Plaintiff "must—by deposition, answers to interrogatories, affidavits, and admissions on file—show specific facts that reveal a genuine issue for trial."  *Laster*, 746 F.3d at 726 (citing *Celotex Corp.*, 477 U.S. at 324).

### B.    Plaintiff's deliberate-indifference claim is dismissed with prejudice.

"To state a claim under 42 U.S.C. § 1983, a plaintiff must set forth facts that, when construed favorably, establish (1) the deprivation of a right secured by the Constitution or laws of the United States (2) caused by a person acting under the color of state law." *Sigley v. City of Parma Heights*, 437 F.3d 527, 533 (6th Cir. 2006) (citing *West v. Atkins*, 487 U.S. 42, 48 (1988)).

With respect to the second prong, it is clear that Defendants are subject to suit under § 1983 because they acted "under the color of state law."  "It is well[-]settled that private parties that perform fundamentally public functions, or who jointly participate with a state to engage in concerted activity, are regarded as acting 'under color of state law' for purposes of § 1983."  *Bartell v. Lohiser*, 215 F.3d 550, 556 (6th Cir. 2000). "Contracting out prison medical care does not relieve" the Commonwealth or its counties of the "constitutional duty to provide adequate medical treatment to those in its custody,

and does not deprive … prisoners of the means to vindicate their" constitutional rights. *West*, 487 U.S. at 56; *see also Hicks v. Frey*, 992 F.2d 1450, 1458 (6th Cir. 1993). Defendants do not contest this conclusion. (Doc. # 48-1 at 17). Because there is no dispute that the Defendants in this case acted "under color of state law," the "Court's inquiry must focus on" the first prong—"whether there was an actionable deprivation of a right secured under the Constitution or the laws of the United States."[2] *Miller v. Calhoun Cty.*, 408 F.3d 803, 812 (6th Cir. 2005).

Plaintiff claims that the Defendants violated Griffith's Eighth Amendment rights.[3] (Doc. # 1 at ¶ 42). The Constitution requires the Government, and those who have been

---

[2]   "Being subject to suit under § 1983, however, does not mean that a party has the right to assert qualified immunity." *Harrison v. Ash*, 539 F.3d 510, 521 (6th Cir. 2008); *see also McCullum v. Tepe*, 693 F.3d 396, 700 (6th Cir. 2012). The Sixth Circuit has held that "the purposes of qualified immunity do not support the extension of the doctrine to nurses employed by a private" corporation, providing medical services to inmates. *Id.* at 524. Therefore, Defendants do not attempt to argue, and are not eligible for, qualified immunity on Plaintiff's § 1983 claims. Accordingly, qualified immunity, which often plays a pivotal role in § 1983 cases, will not be addressed in this Memorandum Opinion and Order.

[3]   Plaintiff's Complaint contains a count alleging a violation of Griffith's rights guaranteed by the Kentucky Constitution. (Doc. # 1 at ¶ 45-48). The contours of this state-constitutional claim are unclear. Plaintiff neither cites to specific sections of the Kentucky Constitution nor provides details from which the Court could ascertain which provisions of the Kentucky Constitution have allegedly been violated. Therefore, the Court is left reading tea leaves with respect to this claim.
   Section 17 of the Kentucky Constitution prohibits the infliction of cruel punishment. Ky. Const. § 17. The Kentucky Supreme Court has determined that Section 17 is virtually identical to the Eighth Amendment of the United States Constitution, and therefore, the analysis of such claims can be collapsed. *Riley v. Kentucky*, 120 S.W.3d 622, 633 (Ky. 2003). However, claims alleging violations of state-constitutional rights are "not cognizable under § 1983," which provides a cause of action only for violations of federally created rights. *Radvansky v. City of Olmsted Falls*, 395 F.3d 291, 314 (6th Cir. 2005). Nor is there an analogue to § 1983 under Kentucky law. *St. Luke Hosp., Inc. v. Straub*, 354 S.W.3d 529, 534-38 (Ky. 2011) (holding that neither the Kentucky Constitution nor any Kentucky statute "create[s] a private right of action for violations of the state constitution" and refusing to judicially create a constitutional tort for state-constitutional violations). Thus, to the extent Plaintiff has attempted to assert a cause of action for violation of Section 17 of the Kentucky Constitution, that claim must be dismissed.
   Section 241 of the Kentucky Constitution, however, provides for the recovery for wrongful death, and a state statute—Ky. Rev. Stat. Ann. § 411.130—provides the cause of action. Accordingly, Plaintiff's wrongful-death claim will be addressed *infra*.

delegated governmental power, "to provide medical care for those whom it is punishing by incarceration," and "the failure to provide such medical care may result in a violation of the Cruel and Unusual Punishments Clause of the Eighth Amendment." *Harrison v. Ash*, 539 F.3d 510, 518 (6th Cir. 2008) (quoting *Estelle v. Gamble*, 428 U.S. 97, 103 (1976)). "Although the Eighth Amendment's protections apply specifically to post-conviction inmates … the Due Process Clause of the Fourteenth Amendment operates to guarantee those same protections to pretrial detainees." *Miller*, 408 F.3d at 812 (citing *Barber v. City of Salem, Ohio*, 953 F.2d 232, 235 (6th Cir. 1992); *Thompson v. Cty. of Medina, Ohio*, 29 F.3d 238, 242 (6th Cir. 1994)). Thus, pretrial detainees, like Griffith, "have a right to adequate medical treatment that is analogous to the Eighth Amendment rights of prisoners." *Watkins v. City of Battle Creek*, 273 F.3d 682, 685-86 (6th Cir. 2001) (citing *City of Revere v. Mass. Gen. Hosp.*, 463 U.S. 239, 244 (1983)).

"To sustain a cause of action under § 1983 for failure to provide medical treatment, plaintiff must establish that the defendants acted with 'deliberate indifference to serious medical needs.'" *Watkins*, 273 F.3d at 686 (quoting *Estelle*, 428 U.S. at 104). "Deliberate indifference is a stringent standard of fault." *Miller*, 408 F.3d at 815. It is not "mere negligence." *Watkins*, 273 F.3d at 686. After all, "medical malpractice does not become a constitutional violation merely because the victim is a prisoner." *Estelle*, 429 U.S. at 106. Nor does "every claim by a prisoner that he has not received adequate medical treatment state[ ] a violation of the Eighth [or Fourteenth] Amendment." *Id.* at 105.

"[I]n the medical context, an inadvertent failure to provide medical care cannot be said to constitute 'an unnecessary and wanton infliction of pain.'" *Id.* at 105-06. Accordingly, "a complaint that a physician has been negligent in diagnosing or treating a

medical condition does not state a valid [constitutional] claim of medical mistreatment." *Id.* Similarly, "[w]hen a prison doctor provides treatment, albeit carelessly or inefficaciously, to a prisoner, he has not displayed a deliberate indifference to the prisoner's needs, but merely a degree of incompetence which does not rise to the level of a constitutional violation." *Comstock v. McCrary*, 273 F.3d 693, 703 (6th Cir. 2001).

Although the treatment Griffith received was ultimately unsuccessful as he later died, this fact is of no consequence to whether the Defendants were deliberately indifferent to Griffith's serious medical need. Instead, the Plaintiff's allegations must allege that the Defendants acted with "deliberate indifference" to Griffith's serious medical needs, before the case can proceed to a jury.

Specifically, a deliberate-indifference claim has "two components, one objective and one subjective." *Comstock*, 273 F.3d at 702. "The failure to address a serious medical need rises to the level of a constitutional violation" only "where both objective and subjective requirements are met." *Harrison*, 539 F.3d at 518 (internal citations omitted).

### 1.   *Objective Component*

"First, the failure to protect from risk of harm must be objectively 'sufficiently serious.'" *Id.* (citing *Farmer v. Brennan*, 511 U.S. 825, 833 (1994)). "To meet this requirement, [plaintiff] must show 'the existence of a sufficiently serious medical need.'" *Id.* (quoting *Blackmore v. Kalamazoo Cty.*, 390 F.3d 890, 895 (6th Cir. 2004)). "A serious medical need is 'one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention.'" *Id.* (quoting *Blackmore*, 390 F.3d at 897).

In the instant case, the parties do not dispute that the Plaintiff has established the objective component of her § 1983 claim. Nor could they. Griffith suffered from pyopneumoperitoneum, perforation of duodenal ulcer, and peptic ulcer disease, and died as a result. *See Rouster v. Cty. of Saginaw*, 749 F.3d 437, 446 (6th Cir. 2014) (characterizing a "perforated duodenum" as "an objectively serious need for medical treatment."). Thus, the parties' arguments, and the Court's analysis, focus on whether Plaintiff has satisfied the subjective component of her deliberate-indifference claim.

## 2. Subjective Component

"Second, to satisfy the subjective requirement, [plaintiff] must show 'a sufficiently culpable state of mind in delaying medical care.'" *Id.* (quoting *Blackmore*, 390 F.3d at 895). "Officials have a sufficiently culpable state of mind where officials act with 'deliberate indifference' to a serious medical need." *Jones v. Muskegon Cty.*, 625 F.3d 935, 941 (6th Cir. 2010) (citing *Farmer*, 511 U.S. at 834). "The Supreme Court has defined 'deliberate indifference' as being more than mere negligence but less than acting with purpose or knowledge." *Id.* "Instead, the prison official must have acted with a state of mind similar to recklessness." *Id.*

To prove the required level of culpability, a plaintiff must allege facts, which if true, would show that: "(1) 'the official being sued subjectively perceived facts from which to infer substantial risk to the prisoner;' (2) the official 'did in fact draw the inference;' and (3) the official 'then disregarded that risk.'" *Anthony v. Swanson*, No. 16-3444, 2017 WL 2992224, at *2 (6th Cir. Jul, 14, 2017) (quoting *Rouster*, 749 F.3d at 446). Under this framework, "an official's failure to alleviate a significant risk that *he should have perceived but did not*, while no cause for commendation, cannot … be condemned as the infliction

of punishment." *Farmer*, 511 U.S. at 838 (emphasis added).

The "plaintiff bears the onerous burden of proving the official's subjective knowledge." *Comstock*, 273 F.3d at 703. However, "this element is subject to proof by 'the usual ways, including inference from circumstantial evidence.'" *Id.* (quoting *Farmer*, 511 U.S. at 842). Thus, it is "permissible for reviewing courts to infer from circumstantial evidence that a prison official had the requisite knowledge." *Id.* A "court must also consider other factors—such as the obviousness of the risk, the information available to the official, the observable symptoms, and the expected level of knowledge of the particular official." *Sours v. Big Sandy Reg'l Jail Auth.*, 593 F. App'x 478, 484 (6th Cir. 2014) (internal citations omitted).

"If a risk is obvious or if it is well-documented and circumstances suggest that the official has been exposed to information such that she must have known of the risk, the evidence is sufficient for a jury to find that the official had knowledge." *Id.* (citing *Farmer*, 511 U.S. at 842-43). Accordingly, "a prison official 'may not escape liability if the evidence showed that he merely refused to verify underlying facts that he strongly suspected to be true, or declined to confirm inferences of risk that he strongly suspected to exist.'" *Comstock*, 273 F.3d at 703 (quoting *Farmer*, 511 U.S. at 843 n.8). But, "it is not enough for plaintiff to demonstrate a question of fact whether the [defendants] *should have known*" that there was a substantial risk of harm. *Watkins*, 273 F.3d at 686.

### a.  Nurse Nichols and Nurse Practitioner Hatfield[4]

---

[4]     The subjective component of a deliberate-indifference claim must be addressed for each defendant individually. *Phillips v. Roane Cty., Tenn.*, 534 F.3d 531, 542 (6th Cir. 2008); *see also Garretson v. City of Madison Heights*, 407 F.3d 789, 797 (6th Cir. 2005). Accordingly, the Court must separately "consider whether each individual defendant had a sufficiently culpable state of mind." *Id.* However, because the facts known and actions taken by Nurse Nichols and Nurse

Because the subjective component of the deliberate-indifference standard requires a fact-intensive inquiry, the Court will briefly recount the interactions Nurse Nichols and Nurse Practitioner Hatfield had with Griffith, and then summarize the facts known to each of the Defendants when they made their treatment decisions.

Nurse Nichols had approximately four interactions with Griffith on Thursday, February 13, 2014, each occurring within a matter of five hours. (Doc. # 48-13 at 1-3). She was the only medical provider to perform in-person, physical examinations of Griffith. *Id.* Nurse Nichols documented Griffith's complaints, observed him vomit, checked his vitals, examined Griffith's abdomen, performed a urinalysis, drew blood for other tests, requested and reviewed Griffith's medical records from King's Daughters Medical Center, and communicated with her supervisor, Nurse Practitioner Hatfield, regarding Griffith's care. *Id.*

Nurse Practitioner Hatfield had one "telemed" interaction with Griffith on Thursday, February 13, 2014. *Id.* at 4. Before and after this "telemed" examination, Nurse Nichols informed Nurse Practitioner Hatfield of Griffith's condition, updated her with test results, and reviewed the information contained in Griffith's medical records.

At the time Nurse Nichols and Nurse Practitioner Hatfield cared for Griffith, they knew the following facts: (1) Griffith complained of severe abdominal pain, (2) Griffith was experiencing nausea and vomiting, (3) Griffith's vital signs were normal, (4) Griffith's abdomen was "soft" and "non-tender to touch," (4) Griffith had a history of Hepatitis-C and pancreatitis, (5) Griffith had suffered from similar pain recently, and (6) Griffith's urinalysis revealed that he was possibly dehydrated, but was otherwise unremarkable. Nurse

Practitioner Hatfield are virtually identical, the Court will avoid duplication and provide a combined analysis where appropriate.

Nichols knew one additional fact—that Griffith's complaints of pain and nausea persisted the night of Thursday, February 13th.[5]

Even when viewed in the light most favorable to the Plaintiff, these facts do not establish a dispute of material fact with respect to deliberate indifference. It is undisputed that the Defendants were *not* aware of one critical fact—Griffith's medical history of peptic ulcer disease and a duodenal ulcer. Nor were the Defendants aware of facts from which they could have inferred that Griffith was at a substantial risk of harm. This is not a case where the Defendants "merely refused to verify underlying facts that [they] strongly suspected to be true, or declined to confirm inferences of risk that [they] strongly suspected to exist." *Comstock*, 273 F.3d at 703. The risk posed to Griffith by his peptic ulcer disease, or the perforation of a duodenal ulcer, was not "obvious" or "well-documented," and there are no facts to suggest that Nurse Nichols or Nurse Hatfield were "exposed to information such that [they] must have known of the risk." *Sours*, 593 F. App'x at 484. Moreover, it is undisputed that neither Nurse Nichols nor Nurse Practitioner Hatfield drew such an inference.

Nurse Nichols and Nurse Practitioner Hatfield treated Griffith for the condition that they thought he had—severe abdominal pain and possible pancreatitis. (Docs. # 48-13; 48-5 at 29:21-30:9; and 48-6 at 46:14-22, 52:23-53:22, 55:15-56:1). They were wrong.

---

[5] Plaintiff has called Nurse Nichols's 10:00 p.m. call into question, as the Detention Center's call logs do not reflect the call. (Doc. # 51 at 3). However, because the call increases the facts available to Nurse Nichols—that Griffith's complaints of pain and nausea had persisted—the Court will consider this fact in addressing Nurse Nichols's subjective knowledge.

There is no indication in the record that Nurse Nichols notified Nurse Practitioner Hatfield that Deputy McDavid had informed her that Griffith's complaints of pain and nausea had persisted, or that Phenergan and Tylenol had been re-administered. Instead, Nurse Nichols's notes indicate only that she informed Deputy McDavid that Nurse Practitioner Hatfield could be contacted if needed. (Doc. # 48-13 at 3).

But, it is undisputed that Nurse Nichols and Nurse Practitioner Hatfield did *not* know, nor do the facts permit the drawing of an inference, that Griffith was suffering from peptic ulcer disease and the perforation of a duodenal ulcer.

Furthermore, neither Nurse Nichols nor Nurse Practitioner Hatfield consciously disregarded Griffith's complaints or needs, nor did they fail to treat what they thought was severe abdominal pain and potential pancreatitis.[6] Although the "diagnosis ultimately proved to be incorrect," Nurse Nichols's and Nurse Practitioner Hatfield's "treatment represented a reasoned, good-faith effort to treat [Griffith's] symptoms." *Shade v. City of Middletown, Ohio*, 200 F. App'x 566, 569-70 (6th Cir. 2006). Put simply, the Defendants' "actions clearly did not exhibit the recklessness or callous disregard for" Griffith's well-being that has been "exemplified" in "decisions finding § 1983 liability." *Id.* at 570. Accordingly, Plaintiff's deliberate-indifference claim fails to satisfy the subjective component.

Plaintiff's arguments, which can be best characterized as complaints that Defendants *should have done more* to treat Griffith, fail to persuade the Court to conclude otherwise. Specifically, Plaintiff argues that Defendants "deviated from the standard of care" by failing to transport Griffith "to a higher level of care and/or hospital," and instead transferred Griffith "to a medical cell, when he clearly should have been taken to a hospital so he could have been properly treated with acid[-]reducing medicine or anti[-]ulcer medicine." (Doc. # 51 at 8, 11). Plaintiff also claims that the Defendants failed to "diligently inquire into [Griffith's] past medical history," and failed Griffith "by only

---

[6] Even "in cases where prison officials actually knew of a substantial risk to inmate health or safety, they may be found free from liability if they reasonably responded to the risk, even if the harm ultimately was not averted." *Harrison*, 539 F.3d at 519 (citing *Farmer*, 511 U.S. at 844) (internal quotation marks omitted).

conducting a cursory examination of incomplete medical records." *Id.* at 10.[7]

It is true that "prison officials may not entirely insulate themselves from liability under § 1983 simply by providing some measure of treatment." *McCarthy v. Place*, 313 F. App'x 810, 814 (6th Cir. 2008). "Indeed, deliberate indifference may be established in cases where it can be shown that a defendant rendered 'grossly inadequate care' or made a 'decision to take an easier but less efficacious course of treatment." *Jones*, 625 F.3d at 944-45 (quoting *McCarthy*, 313 F. App'x at 814). However, in order to qualify as "grossly inadequate," the medical care must be "so grossly incompetent, inadequate, or excessive as to shock the conscience or to be intolerable to fundamental fairness." *Miller*, 408 F.3d at 819.

The medical care Nurse Nichols and Nurse Practitioner Hatfield provided was not "grossly inadequate." Nurse Nichols listened to and documented Griffith's complaints, inspected his vomit, checked his vitals, examined his abdomen, performed a urinalysis, drew blood for other tests, dispensed Phenergan and Tylenol, requested and reviewed Griffith's medical records from King's Daughters Medical Center, and communicated with her supervisor, Nurse Practitioner Hatfield, regarding Griffith's care. (Doc. # 48-13 at 1-3). Nurse Practitioner Hatfield reviewed Nurse Nichols's findings, conducted a "telemed" examination, prescribed Phenergan and Tylenol, ordered a urinalysis and additional laboratory tests, and reviewed Griffith's medical records. Neither Nurse Nichols's nor Nurse Practitioner Hatfield's provision of care can be deemed unreasonable in response

---

[7] Plaintiff makes an additional, extraneous argument regarding the Defendants' decision to administer Tylenol to Griffith, knowing he had Hepatitis-C and knowing "Tylenol could be toxic." (Doc. # 51 at 11). This argument is entirely unsupported by the facts in the record. There is no allegation that Griffith's ingestion of Tylenol caused his death or harmed him in any way. (Doc. # 48-7 at 28:14-29:3).

to the symptoms Griffith exhibited, because, as stated above, there is no indication that Nurse Nichols or Nurse Practitioner Hatfield perceived Griffith's ailment as anything other than severe abdominal pain and possible pancreatitis.

"Had [Nurse Nichols or Nurse Practitioner Hatfield] been subjectively aware of the seriousness of [Griffith's] medical condition, [their] decision to treat him only with" Phenergan, Tylenol, a liquid diet, and medical observation "might have been so cursory as to amount to a conscious disregard of his needs." *Rouster*, 749 F.3d at 448. However, Plaintiff has failed to show that Nurse Nichols or Nurse Practitioner Hatfield were "in fact aware that [Griffith] had a serious medical need" that required transportation to a hospital. *Id*. "Indeed, [Nurse Nichols and Nurse Practitioner Hatfield] did not have one very critical piece of information, which might have allowed [them] to draw such a conclusion: [they] did not know that" Griffith had a history of ulcers. *Id*. (finding defendants were not "deliberately indifferent" where they did not know that inmate had been treated the previous year for a perforated duodenal ulcer); *see also Winkler v. Madison Cty., Ky.*, No. 5:15-cv-45-KKC, 2017 WL 3585407 (E.D. Ky. Aug. 18, 2017) (holding same); *Cf. Westlake v. Lucas*, 537 F.2d 857, 859 (6th Cir. 1976) (concluding that a prisoner stated a claim of deliberate indifference because prison officials provided no treatment even after the prisoner informed them that he suffered from an ulcer and needed medication and a special diet).

Similarly, the failure to request and review more, or different, medical records does not constitute deliberate indifference. The Sixth Circuit has held that failure to check medical records is "negligence at most." *Sanderfer v. Nichols*, 62 F.3d 151, 155 (6th Cir. 1665) ("While perhaps in hindsight [defendant] *should* have checked [inmate's] medical

history records, her failure to do so is negligence at most."). Here, Defendants *did* attempt to obtain a fuller picture of Griffith's medical history. Nurse Nichols requested medical records from King's Daughters Medical Center and reviewed them with Nurse Practitioner Hatfield. Significantly, those medical records did not indicate any prior history of ulcer problems. If a complete failure to request and review medical records does not amount to deliberate indifference, neither does a failure to request and review *all potentially pertinent* medical records.[8]

Even if Nurse Nichols or Nurse Practitioner Hatfield could have done more, the facts do not show that Nurse Nichols or Nurse Practitioner Hatfield perceived that Griffith had a more serious condition than severe abdominal pain and possible pancreatitis, and they certainly do not show that Nurse Nichols or Nurse Practitioner Hatfield consciously disregarded any risk to a serious medical need. The "standard is not whether there is something easy that the doctors, with the benefit of hindsight, could have done.'" *Rouster*, 749 F.3d at 453 (quoting *Williams v. Mehra*, 186 F.3d 685, 692 (6th Cir. 1999) (en banc)). The Court can only "judge [Defendants'] actions based on the information that was available to them at the time." *Id.* Therefore, the Plaintiff has failed to create a genuine dispute as to any material fact, and Defendants are entitled to summary judgment on the deliberate-indifference claim.

### b.  Correcthealth

As a private corporation that "perform[s] a traditional state function such as

---

[8]  Griffith's alleged mental deficits do not compel a different conclusion. First, there is no evidence in the record to corroborate Griffith's claim of a "learning disability." (Doc. # 48-12). Nor is there any evidence in the record to establish the nature or severity of Griffith's alleged mental deficits. Furthermore, there is no evidence in the record to support Plaintiff's argument that because of Griffith's learning disability, "the Defendants should have known" that Griffith "may not be able to relate specific medical diagnoses to them." (Doc. # 51 at 9).

providing medical services to prison inmates," Correcthealth may be sued under § 1983. *Street v. Corrs. Corp. of Am.*, 102 F.3d 810, 814 (6th Cir. 1996). However, "private corporations cannot be held liable on the basis of *respondeat superior* or vicarious liability." *Rouster*, 749 F.3d at 453 (citing *Street*, 102 F.3d at 818). Therefore, the Plaintiff must prove that there has been a constitutional violation and "that a policy or custom" of Correcthealth "was the 'moving force' behind the deprivation" of constitutional rights. *Id.* (quoting *Miller v. Sanilac Cty.*, 606 F.3d 240, 254-55 (6th Cir. 2010)).

The Plaintiff argues that Correcthelath established policies, procedures, and customs "that ultimately led to" Griffith's death, as well as "constitutional violations" by Correcthealth employees. (Doc. # 51 at 12). Specifically, Plaintiff makes three allegations against Correcthealth. First, Plaintiff claims that Nurse Nichols and Nurse Practitioner Hatfield failed to follow Correcthealth's "Emergency Services" policy, which requires transfer to a hospital if the "patient's needs exceed the capabilities" at the Detention Center. (Doc. # 51 at 13). Second, Plaintiff contends that Correcthealth "failed to have in place a policy, which allowed for the Defendants to promptly assess" Griffith's "worsening condition." *Id.* And lastly, Plaintiff alleges that Correcthealth "failed to properly train its medical providers on the proper procedures and protocols to use to [assess] a patient who has worsening symptoms." *Id.* at 14.

However, for Correcthealth to be liable, Plaintiff must identify some policy, procedure, or custom that caused a violation of Griffith's constitutional rights. *See Grose v. Corr. Med. Servs., Inc.*, 400 F. App'x 986, 989 (6th Cir. 2010) (citing *Perez v. Oakland Cty.*, 466 F.3d 416, 430 (6th Cir. 2006)). As discussed above, Plaintiff is unable to create a genuine dispute as to whether Griffith's constitutional rights were violated. Therefore,

the Court need not consider whether Correcthealth's policies or training might have caused such a violation. *Rouster*, 749 F.3d at 454. Accordingly, Correcthealth is entitled to summary judgment on Plaintiff's deliberate-indifference claim.

### C.    Plaintiff's wrongful-death claim is dismissed without prejudice.

With respect to Plaintiff's wrongful-death claim, Defendants contend that this Court should grant summary judgment because Plaintiff has failed to produce sufficient expert-witness testimony regarding the standard of care and proximate cause. (Doc. # 48-1 at 28-30).

The granting of summary judgment and consequent dismissal of Plaintiff's § 1983 claims renders this Court's jurisdiction over the remaining state law claims solely supplemental under 28 U.S.C. § 1367.[9] The Sixth Circuit has held that "a federal court that has dismissed a plaintiff's federal-law claims should not ordinarily reach the plaintiff's state-law claims." *Rouster*, 749 F.3d at 454; *see also Moon v. Harrison Piping Supply*, 465 F.3d 719, 728 (6th Cir. 2006); *United Mine Workers of Am. v. Gibbs*, 383 U.S. 715, 726 (1966) ("Certainly, if the federal claims are dismissed before trial … the state claims should be dismissed as well.").

Federalism cautions that "[n]eedless decisions of state law should be avoided both as a matter of comity and to promote justice between the parties, by procuring for them a surer-footed reading of applicable law." *Gibbs*, 383 U.S. at 726. This Court has consistently adhered to these principles of federalism, and continues to do so in the instant case. *See, e.g.*, *Schulker v. Kenton Cty., Ky.*, No. 2:10-cv-143-DLB, 2013 WL

---

[9]    Although Correcthealth is a Georgia-based corporation, complete diversity of citizenship, as required by 28 U.S.C. § 1332, does not exist due to the presence of Nurse Nichols, a citizen of the Commonwealth of Kentucky.

190210, at *8 (E.D. Ky. Jan. 17, 2013).  Because Plaintiff's remaining wrongful-death claim arises under state law and implicates complex questions regarding the standard of care for nursing professionals in the Commonwealth, the Court declines to exercise supplemental jurisdiction, and Plaintiff's wrongful-death claim is dismissed without prejudice.

## III.  CONCLUSION

Accordingly, for the reasons stated herein,

**IT IS ORDERED** as follows:

(1)    Defendants Correcthealth Kentucky, LLC, Michale D. Nichols, and Susie Hatfield's Motion for Summary Judgment (Doc. # 48) is **granted**;

(2)    Plaintiff Mary Griffith's federal Section 1983 deliberate-indifference claim is **dismissed with prejudice**;

(3)    Plaintiff Mary Griffith's state law wrongful-death claim is **dismissed without prejudice**; and

(4)    This action is **dismissed** and **stricken** from the Court's active docket.

This 30th day of August, 2017.



Signed By:
*David L. Bunning*   DB
United States District Judge

K:\DATA\Opinions\Ashland\15-5 MOO re MSJ.docx